Are you ready? May it please the Court, I'm Jim Warren from Jackson, Mississippi. I represent the appellants in this matter. The first thing that I would say to the Court is that it seems clear that the District Court was in error in the grant of summary judgment on the issue of contributory negligence. The only issue, at least based on the briefs of the parties before this Court, is an issue of law with respect to the nature of the acts and omissions that form the basis of the Court's grant of summary judgment. And by that I mean all of the acts and omissions that form the basis of the summary judgment below occurred after the negligent act and injury. In other words, after the fire in the peanut dome. And in the Court's opinion, all of the acts or omissions identified that plaintiff was supposedly guilty of occurred after the fire started. In other words, they related to extinguishment, the handling of, the putting out of the fire. Are you talking about the contributory negligence point? Yes, Your Honor. Your opposing counsel doesn't contest that. What the appellee says is they're issues of fact. What we say is as a matter of law, none of those acts or omissions can constitute contributory negligence. There's really no disagreement about that. Then I'll move on to the next issue. You don't have to, but there's no disagreement. The only concern that we would have is that if this is sent back for trial without a clear statement by this Court that as a matter of law, those issues cannot be contributory negligence, you may see the case again with an issue with respect to a jury instruction that's given on contrib with respect to those issues. And that's the only reason why I pointed that out to the Court. We appealed from that grant of summary judgment. In the briefing by appellee, they raised a basis for this Court to affirm the district court on other grounds. And that relates principally to their interpretation of the economic loss rule as it might affect this case. Now, the court below found that the economic loss rule was obviated here because there was damage to other property. And essentially, the analysis by the district court below was that the subject matter of this service agreement, which was an agreement to apply aluminum phosphide tablets to a peanut dome, was in fact the aluminum phosphide tablets. And so when they caused an ignition in the dome and damaged the peanuts and ultimately the dome itself, first by damages from the fire and second by an explosion, which occurred later, that constituted damage to other property. And so therefore, the economic loss rule would not apply in this case. We agree with that. However, we would take a step back from that and point out to the Court that the economic loss rule probably should not apply at all in the case of a service agreement such as this. The roots of that rule are in contracts for the sale of goods. It has been extended to the sale of structures, the construction of structures, homes and roofs, things like that. But in what is essentially a pure service agreement, I will accept your money to treat a facility or to perform some other service. The economic loss rule really doesn't fit. I thought that the Ports Authority, which is the case that established the economic loss doctrine in North Carolina, wasn't that a services contract? No, it related to construction, specifically with respect to roofs, I believe, Your Honor. But a service, not the sale of goods. Well, the way I would distinguish the things is that it might involve a service, but at the end of the process there is some structure created, something built, something changed. In the case of this particular contract, the pesticide application agreement, the peanuts were already there. The structure was already there. There was nothing added to or taken away from the structure. There were simply aluminum phosphide tablets that were put inside the structure. They turn into phosphine gas, kill pests, and then after a period of time should go away and no longer be poisonous. What's your best North Carolina case to say that economic loss doesn't apply in service contracts? Because I see unpublished district court opinions where they have applied, so I'm wondering what's your best case for that proposition? I don't think the issue has been directly addressed. I think the best you can do, Your Honor, is to say that indirectly it is addressed because the North Carolina cases that focus on this doctrine make clear that it's about the sale of goods. When you talk about Moore v. Coachman, which this court has cited and quoted from, it's clear that the origin of the rule is in the sale of goods. And the reason for that is that if I buy 1,000 widgets from you and they don't meet my expectations, we should have provided for that in contract. This is not a widget sales case. This is a case involving serious public health and safety issues, involving a highly regulated activity, and involving the provision of a service. And so this is kind of a backwards way to answer your question, but to get back to your question, the case cited in North Carolina State Forts Authority, the fireman's mutual case, the high point sprinkler case, which makes this statement, a carpenter who contracts to repair a house is liable in damages if he performs the repair so unskillfully as to damage other portions of the structure. Here the carpenter was not employed to work on the dome. This was a pest control applicator that was employed to put a dangerous substance inside this dome. I know you're not from this circuit. We're hamstrung a little bit in that North Carolina doesn't have a certification procedure where we can ask the Supreme Court these questions. So that's why I'm wondering what your best case is because we're going to have to figure it out on our own. And they might object to some lawyer from Mississippi speaking for them, but I will say this, that I don't think certification is necessary in this situation. If this court simply wants to look at it as if the economic loss rule does have potential application, the other property exception takes us back out of the rule. And it seems clear to me that... You may or may not be right on that. I have my questions, but what about the main ground that the district court ruled on, which was consequential damages exclusion? The way this case comes to you, Your Honor, is correct. When we perfected our appeal with respect to the contributory negligence ruling, not knowing the position the other side would take. Let me just express to you my concern, which was that this is a very broadly worded consequential damages exclusion. It even goes to the lengths of denominating the items of consequential damages for which recovery would be precluded. And the exclusion appears in a very short contract. It's only two pages, so it's not something that you would miss. And it's not a contract of adhesion. It's obviously an individually negotiated document here, and it's a contract signed between two commercial establishments in an arm's length negotiation. So we have a short contract and commercial establishments negotiating it and a fairly broadly worded provision. Judge Boyle looked at it and said, I'm just going to go with the plain language of the contract here and find that recovery in the amount that you want is barred. This is a fight between insurance companies, and I guess you appear in a capacity as sub-roguee, but when we go back to the contract, didn't the exclusion allow the insured here to get the services a whole lot more cheaply? These consequential damages exclusions hold costs of services down. What was wrong with what the district court did? Your Honor, you said a lot there. I'll try to address it one point at a time. First of all, the most important thing is that the district court, in his opinion that Your Honor is citing to, made clear that this contract had no impact on the tort claims. The word tort, the word negligence, is nowhere in the contract. And I will respectfully disagree with Your Honor as to whether it was conspicuous or clear. I believe the contract to be ambiguous. I have read it numerous times in preparation for this argument, and I still don't completely understand what it means. However, the district court held as a matter of law that this contract excluded all damages, not just consequential damages, all damages, every single damage we allege, damage to the peanuts, damage to the dome, cost of extinguishment, debris removal, everything that could, and all business losses, any kind of damage you could imagine. But the consequential damage exclusion specifically speaks to product. It damages to product. Well, in one place it does. In the portion of the contract that relates to the client's responsibilities, which, by the way, also has in it an unlimited indemnity provision that applies to the client, there is a definition or a listing of potential damages that are included, and you're right, Your Honor, property, product, equipment, overtime, and loss of business. And so as a result, what we have here is an exculpatory provision. There are no damages that my client can recover in this matter. And unlike a lot of the other cases that this Court has dealt with where you have a pure sale of goods situation, there's no warranty provision, there's no limitation of liability, there's just no liability. And the North Carolina cases make clear that where a substantial public interest is involved, the clauses like this cannot be enforced. I was a little curious about that. You talk about the public interest, but it's hard to see the interest of the public implicated in a breach of contract action between two commercial entities negotiating at arm's length. Well, that's one of the ways. A non-arm's length situation is one of the ways you can negate a provision like this, but it's not the only way. Substantial public interest stands on its own, and in McMurray, for example. I was just asking you to identify it. The substantial public interest? The North Carolina Pest Control Act, which specifically says there is a substantial public interest in that. I understand. You're suggesting that against the context of a highly regulated business, a highly regulated endeavor. Not just that. The public has an interest in what happens at that dome. This is not an issue as between two private. Why isn't the public interest represented by the regulations and the requirement that the fumigant company get a certificate? In other words, yes, it is regulated, and the public interest is embodied in the certification requirements. One of the difficulties of your position here is that this was under the requisite regulations. The company here was certified to do this kind of business. The difficulty I'm having is that you negotiated a contract. It allowed you to get the service a great deal more cheaply done, and then afterwards it turns out to be a bad bargain. You sort of have buyer's remorse, but that happens in contractual law all the time. Your client could protect itself in one of two ways. It could protect itself in contract negotiations, or it could protect itself in purchasing insurance. It purchased insurance and got reimbursed. Your Honor, may I proceed? I'm two and a half minutes over. I just want to make sure that I make this as clear as I can. There is no buyer's remorse here. This is not a contract for the sale of goods where the price went up or down on some commodity or where they weren't delivered on time or anything like this. What happened here was so far outside the contemplation of the parties involved in this matter that it strains imagination. What the parties would have been concerned about going into this contract is whether or not the phosphine gas was going to kill all the pests, and if it hadn't done that, there might have been bugs eating the peanut. Excuse me, and I'm sorry to interrupt, but you're right. I was actually very interested in your response to Judge Wilkinson's question because I have the same concern. You pay $8,600. You're seeking $20 million in consequential damages. And as Judge Wilkinson is suggesting, the strict cabining of the consequential damages in your benefit in the lower price you paid for the insurance policy. So why does the fact that, and North Carolina courts have said they are concerned about public safety and the protection of the public when the parties are not in a position to protect themselves. And here you were in a position to protect yourself but chose not to do so. Your Honor, I respectfully disagree with that. And here's why. The North Carolina case law and the case law of this court in the McMurray case makes clear that where the public interest is implicated is where something can happen in the context of a commercial or noncommercial relationship, and I don't think it matters which one, that can injure the public or cause problems. In this particular situation, you have the application of a gas that is poisonous to people who are not parties to the contract and can cause fires and damages that can hurt first responders, that can cause environmental damage. And in fact, in this case, the EPA was on the scene immediately after the fire started. And this certainly poses... But you knew that going in. You knew that the phosphate gas had this potential going in, and it's not as if you were blindsided by that. I mean, the problem is you're asking us to do something for you that you didn't do for yourself. Your Honor, I would just say that this contract and its attempt at exculpatory language should not be enforced and would not be enforced by a North Carolina court. And the reason I say that is that the activity involved implicates the public interest more than driving, more than motorcycle training. I don't know that that's true. And your view about exculpatory provisions, all consequential damage provisions are exculpatory. That's the whole reason that they're put into contract, is that companies are trying to limit risk, and to that extent, they're exculpatory. And one of the things I'm not clear about with respect to your argument about unconscionability and the public interest and the rest is I don't know what the limiting principle to all that is. And consequential damage is exclusion. They're a critical part of doing business for many, many companies. And you start eroding these, and you get rid of a mechanism by which risk is predictable and prices of services can be held down. And I read all you said about unconscionability, and I read all you said about the public interest and about regulated industries, but I don't understand where the limiting principle is. I mean, I don't understand what the framework is once we start disregarding the contractual language. Judge Boyle took a look at it, and he said this is the way I read it. I probably should end my time and address these on rebuttal, but I will say this, that this public interest matter is serious and important, and the North Carolina courts have made it clear that it is. And where you have an exculpatory provision, I think there are lots of problems with this provision, and we address those in our brief, but if you assume it is as the district court saw it, then it's not enforceable under North Carolina law. And I would respectfully say to this court that this court's role would be to apply North Carolina law as it has done in the past with respect to provisions of this type. Wouldn't it make you a little nervous to have a federal court be an organ, a policy organ for North Carolina law and say we're going to invalidate this based on North Carolina public policy when the case law for making ourselves a spokesperson for North Carolina public policy just isn't there? All I can say is that I think that horse is out of the barn with respect to this issue in the sense that the role of the court here is to enforce North Carolina law as it understands it. And if Your Honor looks at the discussion in the McMurray case, it is very clear that that's a treatise on what North Carolina law is here. And while the commercial relationship would have an impact on whether this is an arm's-length provision, and by the way, Your Honor, there's no evidence about any negotiation of this provision. This is a form contract, and it's a poorly written one at that. But as the bottom line here, this provision is not enforceable under North Carolina law for the reasons that are clearly stated in this court's earlier opinions, including the McMurray case. You've got some time in reply, Mr. Warren. Let's hear from Mr. Epstein. Thank you, Your Honor. Good morning. May it please the Court, my name is Steve Epstein, and it is my privilege to represent Industrial Fumigant Company and Rollins, Inc., the Apleys. Your Honors, this case involves one of the most fundamental principles underpinning our system of commerce, freedom of contract between commercial enterprises. Virtually every argument I will make comes back to one very simple principle, that commercial enterprises are free to contract with one another as they wish, to price their products and services and to allocate the attendant risks in whatever ways they, as the contracting parties, deem appropriate, that at the time of contract, it is they who need to consider what risks they can accept and what risks they need to shift to others. Our nation's courts have constructed legal that the consequential damages within the contemplation of the parties were damages from pest infestation and not fires and explosions. What do you say about that? If we're going to take the contemplation of the parties, they were really talking about consequential damages from pest infestation and not from fires and explosions. The two-page contract, as Judge Wilkinson, you've already referenced, actually says quite to the contrary because it specifies the consequential damages that at the time of contract my client was seeking to shift to the other side, and those included the loss of the product, in this case the peanuts itself, the loss of property, business losses. All of these, as your Honor said, a very broad list of losses were specified in the contract as consequential damages. Both North Carolina law and the law of many other states specifically allow the parties to specify in their contractual bargains  What potential damages aren't covered by 7B and 8B-11? Those damages that are not consequential, direct damages, Your Honor. Do you have to help me, though? Sure. Because Judge Wilkinson's question goes to this a little bit as well. Why aren't those provisions completely exculpatory? They're not completely exculpatory. First of all, what a true exculpatory clause is, that North Carolina courts do tend to look at with a jaundiced eye, are clauses that alleviate a party of the duty to exercise reasonable care. That's what an exculpatory clause is. The perfect example is on a ski lift. You're given the lift ticket and it says we're not responsible if you break your leg. Well, North Carolina courts have a problem with that because that is absolving the ski company, the ski mountain, of all responsibility for anything and the duty to exercise reasonable care. That's not true here for two reasons. First of all, Severn Peanut Company is the only company, the only individual in the world that was bound by this agreement with respect to the reasonable care that my client had an obligation by statute to exercise. My client had an obligation to apply pesticides with reasonable care. Nothing in this contract changed that. And secondly, this contract only excluded consequential damages. It did not exclude direct damages. So with respect to Well, what would be an example of direct damages that the plaintiff could recover? Give me the categories of direct damages that you think are within the contemplation of the contract. Sure, the quintessential direct damage in a services contract is the failure of the service. So here, if my client came with the wrong chemical or an ineffective chemical or didn't do the job that they were supposed to do, didn't even show up, then they had a right, Severn Peanut Company had a right to cover. They had a right to go out and get someone else to do the job that my client was supposed to do to get the benefit of the bargain embodied by this contract for $8,600. That's direct damage. The damages at issue in this case are clearly a consequence of the performance of the contract. They're not a failure to perform. Failure to perform is direct damages. And certainly direct damages were available to the plaintiff in this case. The direct damages are not what occurred. What occurred were consequential damages. Consequential damages, which hasn't been discussed yet, are at the very heart of the exclusion of consequential damages, is at the very heart of the Uniform Commercial Code. And the notion, as Judge Wilkinson, you said, the notion that parties can't contract away the risk of consequential damages would disembowel the Uniform Commercial Code, which depends upon the ability of parties to be able to shift those kinds of risks. How do you read McMurray? Your Honor, the way I read McMurray is it's a case involving an individual who contracted, who was there working with the government, who, again, like in the ski lift situation, the government tried to absolve itself of the duty to use reasonable care, that we can't be responsible for anything that happens. So you've got two key distinctions between the McMurray district. That the unequal bargaining power. Absolutely. So you don't have sophisticated commercial parties. You have an individual coming onto the property of the government, being driven by somebody working for the government, and she had to sign something saying, if I get hurt, it's on me, it's not on you. That's a completely different scenario than what we have here. Here we have the very foundation of commercial enterprise. McMurray did not involve commercial enterprise on either side. You had the government and you had somebody showing up, not on a contract, but somebody showing up to do a job. And as to unconscionability, North Carolina courts have actually held that the doctrine of unconscionability does not apply to sophisticated commercial parties, like Severn Peanut, who had annual revenues of in excess of $100 million a year. My opposing counsel has said that they never read the contract. They didn't know what was in the contract. That doesn't matter. That doesn't matter. Would the insurance premium depend upon the consequential damages exclusion? In other words, an insurer would typically assess a much higher premium without a consequential damage exclusion, wouldn't it? On my end, yes, Your Honor. My clients would have a much bigger burden. Well, two things are going to happen. One of two things will happen. Either the price of the services, it wouldn't be an $8,600 contract, it might be an $86,000 contract, or alternatively, they would have to procure insurance that would protect them from a loss as extreme as this. Because the subrogation right is worth a lot less if there's a consequential damages exclusion. And the way an insurance company would protect against that would be to charge the insured a higher premium. And, Your Honor, that's certainly outside the record, and I don't know the answer to that question. But Your Honor is absolutely right. They had two ways to protect themselves. They could either protect themselves in this contract or by procuring insurance. And they did protect themselves. That's exactly right. Through one avenue but not the other. That's exactly right. And now, as you said, Your Honor, they have buyer's remorse, or at least Traveler's Insurance Company, who had to pay over $19 million, has buyer's remorse on behalf of its subrogore. It doesn't like the fact that it's stuck holding a $19 million tab, but that was the bargain that was made by the parties. Unconscionability, the second piece of this is, unconscionability is evaluated at the time the contract is made. This Court said that in the Farrar Dairy case. It's evaluated at the time the contract is made, looking through the front windshield, not looking through the rearview mirror. It doesn't matter that Traveler's suffered $20 million in subrogated losses because that's not when you evaluate unconscionability. You evaluate unconscionability at the time of contract here to commercial parties making a contract, no North Carolina law says that creates unconscionability. One of the best cases to address those issues, Your Honor, was just recently decided by the North Carolina Court of Appeals. It's the Malone v. Barnett case that I cited in our SIR reply brief that I appreciate the Court allowing us to file. That case said freedom of contract is a fundamental basic right in North Carolina. Public policy in North Carolina is not violated by an agreement that protects a party from the consequences of its own negligent conduct when the agreement is an arm's length commercial agreement. And that was true in that case even in the face of a statute, ironically the Federal Motor Carrier Safety Administration Act, that provided a duty to the public. That statute was implicated in that case and the Court of Appeals said, No, that statute applies to the duty to the public. With respect to the contracting parties, there is nothing wrong with a contracting party absolving itself of its own negligence if the other contracting party is willing to do that in view of the commercial arrangements between the parties. Were this Court to intervene and unravel the fumigation contract here on the basis that it were unconscionable, what message would that send to commercial enterprise? What confidence could contracting parties have that bargains into which they are entering will be enforced by courts as written, not as one of the parties in hindsight wishes it had been? I want to talk about the tort aspect of this case, and there are two tort issues in this case. The first is the consequential damages exclusion itself and its application not just in contract but in tort. The Moore v. Coachman Industries case that opposing counsel mentioned is directly on point on this issue and it is binding controlling authority. That, too, was a case in which there was a consequential damages exclusion that listed out what was excluded. That listing said we shall not be liable, this was the RV manufacturer warranty, for incidental or consequential damages such as your expenses for transportation, lodging, or loss or damage to your personal property. But the essence of your argument would be a breach of contract is not a tort. There is an exception to that where the tort swings independently of the contract. And as I understand it from reading your brief, you're saying the tort here is not independent of the contract because the effort under both causes of action to recover damages stems from the same act of misapplication of the pesticide. That's correct, Your Honor. And so it's not, I mean, a contract doesn't eliminate all actions in tort, but it eliminates actions that are essentially substitutes for a breach of contract action. And here the contractual duty and the tort duty are synonymous, which is application of the pesticide in accordance with proper labeling. So I just want to make sure I understand your argument because I thought that's what it was. That's absolutely right. So that's the Strum line of cases that I believe Chief Judge Traxler actually wrote the opinion in Strum. The Strum line of cases talks about the independent tort exception, how you could peel away from the contract and have an independent tort responsibility. But that's where there are distinct circumstances that create the tort that have nothing to do with the contract. And as Your Honor said, here you have one and the same. The allegations in the complaint are identical. The breach of contract. Contracts establish duties and tort law establishes duty. And the way you decide whether it's independent is you look at, well, how dissimilar are the duties? And here there's a basic similarity of the contractual duty and the tort duty, which is to apply the pesticide in accordance with the labeling. That's the duty. Exactly. Agree completely, Your Honor. With respect, though, to whether the contractual consequential damages exclusion applies in tort, the Moore v. Coachman Industries case says the answer is yes. In that case, there were two items of personal property, a satellite dish and a receiver, that were potentially recoverable after this RV fire occurred. The court of appeals in that case applied the consequential damages exclusion, which listed personal property as being excluded, to the plaintiff's negligence claims. In other words, a contractual consequential damages exclusion applies equally to a contract claim and a tort claim. And in that respect, Judge Boyle's initial summary judgment order with respect to the consequential damages exclusion was actually erroneous because he said, well, that provision applies only in contract, not to tort. Moore v. Coachman could not be more clear. It applies to both. And then we get to the economic loss doctrine. Even if, even if the contractual consequential damages exclusion did not apply in tort, you have the economic loss doctrine. And with all due respect, the second port's authority exception does not mean what opposing counsel says it means. That exception asks two questions. What property was damaged and was that damaged property the subject of the contract? Those are the two questions. Put another way, was the damaged property extraneous to the defendant's contractual performance? For instance, the Moore case gives us a great example. The satellite dish and the receiver were extraneous to the contractual performance of the manufacturer of the RV. They weren't even purchased at the time the manufacturer manufactured the RV. Therefore, those items of property were, in fact, embraced by the second exception in port's authority. Well, let's look about, let's look at this case. What do we have here? What property was damaged? The peanuts and the storage dome. So the $20 million question in this case, if we get to the economic loss doctrine, is was that damaged property the subject of the fumigation contract? Or, alternatively, was it extraneous to IFC's contractual performance? Your Honors, this isn't rocket science. The very purpose of the fumigation contract was to fumigate the peanuts and the storage dome. The contract says precisely that in its preamble, that it was for the treatment of the commodities and or space. The commodities were the peanuts, the space, as the contract expressly says, was the peanut storage warehouse. Those items of property are analogous not to the RV, I'm sorry, those items of property are analogous to the RV in Moore, not to the satellite dish and receiver in Moore. They were inextricably intertwined with IFC's contractual performance, just as the RV was inextricably intertwined with the manufacturer's performance embodied by the warranty in Moore. The Second Ports Authority exception was intended for property that is extraneous to the defendant's contractual performance, not to property that lies at its very heart. It, therefore, does not apply to the peanuts and the storage dome here. In closing, Your Honors, the decision that plaintiffs would not be entitled to recover for the catastrophic loss of their peanuts and storage dome is one that was very consciously made by Severn Peanut Company itself, long before industrial fumigant company personnel showed up to perform that fumigation. It was a risk that Severn Peanut accepted in exchange for a low price. Those types of tradeoffs are made in thousands upon thousands of commercial contracts every day of every week of every year. Our system of free enterprise depends on courts not paternalistically rewriting those contracts after the fact and enforcing them just as they are written. Your Honors, we ask you to do just that here by affirming the judgment in favor of IFC and Rollins. Thank you for your time. Mr. Warren. Let me approach the time I have left in this way. Let's assume that you have concluded that the contractual exculpatory language is enforceable. Do we have a cause of action left? The district court looked at this contract and concluded that it did not exclude our tort claims. It did not affect our tort claims. And the basis for that was, at least in part, the language of the contract. And, Your Honor, you're correct. It's a two-page agreement. It's at the appendix at 46 and 47. This is a form document that was written by IFC. No input from us except for signing at the bottom. They could have written it any way they wanted to, and I think the signature probably would still be there. The word negligence is not in the document. The word tort is not in the document. The description of damages relates to contractual damages. No, but the tort action is pretty clearly an attempt to circumvent the contractual damage exclusion, and if it was allowed here, it would be allowed in thousands upon thousands of contracts everywhere. And was the word negligence used? No, but the word, the tort duty was clearly expressed in terms of in a manner consistent with instructions, procedures, directions, and precautions set forth in the labeling of the pesticide as required by the Environmental Protection Association. And so you have here a tort duty which clearly embodies a reasonable or reasonableness or negligence standard, and where the duty, the tort duty, is expressed in the contract, if we allow this to unravel the consequential damages exclusion, we're putting them at much, these exclusions as much into question as we would if we did it on a straight contractual ground. In other words, you're seeking to have us, by one way or another, invalidate the provision of this contract or render it ineffectual. And my problem is, to do that in a brief commercial contract between two companies, two commercial companies, without a clear signal from North Carolina law on some vague ground of North Carolina public policy, with all respect, sir, it just strikes me as thin ice. And I don't really, I'm nervous about going where you want to go. And you said, well, this was drafted by the fumigation company and anything they put in there would have been signed. But that can't be the reason for permitting your client to avoid the provisions to which it had agreed. That argument could be brought up every time. Your Honor, for 63 years, it's been the law in North Carolina that contracts which seek to exculpate one of the parties from liability for his own negligence are not favored by the law. We are not breaking new ground here. And they are to be strictly construed against the party drafting it. And what I'm saying to this Court is, if you strictly construe this contract, as you are duty-bound to do under North Carolina law, you cannot find that this contract excludes negligence claims. You have to affirm the decision made by the District Court that this contract does not exclude negligence claims. Now, even if it did, even if this provision could be stretched to apply to tort claims, there is an independent duty here under statute. We have a negligence per se claim in this case. And there is a duty to follow the FFRA and the North Carolina law regarding application of pesticides. And those laws require that the label be followed. And they don't condition it with all reasonable and practical efforts as this contract does. This contract's stated obligation of the company doing the application of IFC is not consistent with the statutory requirement, Your Honor. And so I would respectfully say to this Court that the District Court got it right when it concluded that tort claims were not barred. And if we move over, as counsel would have us do, to the UCC and to the case law that deals with the sale of goods, the subject matter of this contract were the aluminum phosphide tablets. That's the only thing that was brought to the table. And even if they had been installed somehow or another in this dome rather than simply applied to it, under the American Eurocopter case, they would not make the entire dome and peanuts the subject of the contract. The subject of the contract was the aluminum phosphide tablets. And so, therefore, the economic loss rule does not apply because other property, the peanuts, the dome, by the way, what they call consequential damages in this contract, other property, other damages, was damaged. And so, therefore, the economic loss rule would not apply. So we would respectfully ask the Court to reverse the decision of the District Court relative to contributory negligence, make the legal finding that we asked you to at the beginning, and affirm the Court's decision with respect to our tort claims. And furthermore, to find that with respect to the contract claims, the exculpatory provision is not, as a matter of law, enforceable under North Carolina law. Thank you, Mr. Warren. Thank you, Your Honor. I don't think I can make it, but I'd like to take a break. Okay. All right. We'll come down and re-counsel and then take a break for about five or ten minutes. This Honorable Court will take a brief recess.
judges: William B. Traxler, Jr., J. Harvie Wilkinson III, Allyson K. Duncan